UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
                              :
IN RE: NATIONAL LIFE          :
INSURANCE CO.                 :    Case No. 2:97-cv-314
                              :
```

**OPINION AND ORDER**

National Life Insurance Co. ("National Life") has filed a
motion for specific enforcement of this Court's 1998 final order
and judgment approving a settlement agreement in the above-
captioned class action.  National Life is asking the Court to
enjoin the prosecution of a lawsuit brought by Betty Hucke to
recover proceeds from a life insurance policy purchased by her
now-deceased husband.  National Life contends that Mrs. Hucke was
a party to the class action and the 1998 settlement agreement,
that her claims were released pursuant to the Court's final order
and judgment, and that her lawsuit is therefore barred.  Mrs.
Hucke's case is currently pending in the United States District
Court for the Western District of Missouri.

For the reasons set forth below, the motion to enforce is
DENIED.[1]

**Factual and Procedural Background**

In 1997, a group of National Life policyholders filed this
class action claiming unlawful practices relating to the sale of
life insurance policies.  The suit claimed that National Life had

_____

[1]  Also pending is National Life's motion for leave to file a
sur-rebuttal.  That motion (ECF No. 162) is GRANTED.

induced the purchase of policies through misrepresentations and material omissions concerning the number of cash premium payments that a policyholder would have to make, and the cash value and other benefits that a policyholder would realize.  The class plaintiffs alleged that in addition to misrepresenting this information, National Life "approved, prepared and/or permitted the dissemination of" sales materials that were based upon interest rate and cash value projections it knew to be unreasonable and unsustainable.  Finally, the suit alleged that National Life engaged in a sales scheme whereby it financed the purchase of new policies by "churning or stripping" value from existing policies and using the proceeds to purchase the new policies.  This practice of "churning" allegedly generated large commissions for National Life's agents, and "substantial sales loads" for National Life itself.  ECF No. 127 at 21-24.

In June 1998, the parties settled the class action suit. Counsel for the parties entered into a settlement agreement, and payments were subsequently made to class members.  The class action, and the resulting settlement, covered policies issued between January 1, 1982 and December 31, 1997.  The settlement included a release applicable to "any and all causes of action, claims, damages, equitable, legal and administrative relief, interest, demands or rights, of any kind or nature whatsoever . . . that have been, could have been, may be or could be alleged or

2

asserted now or in the future by . . . any Class Member."  ECF
No. 143-1 at 12.  The release defines "Released Transactions" as
"the marketing, solicitation, application, underwriting,
acceptance, sale, purchase, operation, performance, retention,
administration, servicing or replacement" of policies.  *Id.* at
11.  The settlement agreement was incorporated into a final order
and judgment signed by the Court, with the Court retaining
jurisdiction over "all matters relating to administration,
consummation, enforcement and interpretation of the Settlement
Agreement and of this Final Order and Judgment."  *Id.* at 8.

Dr. Samuel Hucke and his wife Betty purchased four life
insurance polices, two for Dr. Hucke and two for Mrs. Hucke,
between 1990 and 1993.  Dr. Hucke's policies consisted of two
universal life insurance policies numbered VL0039748 ("Policy
748") and VL0052646 ("Policy 646").  After Dr. Hucke died in
2012, National Life sent proceeds to Betty Hucke on Policy 646 in
the amount of $138,358.62.  Policy 748 insured Dr. Hucke for
$150,000, with Betty Hucke as the beneficiary.  To date, National
Life has not paid any proceeds on Policy 748.

The summary of coverage for Policy 748 described it as a
"flexible premium adjustable benefit life insurance policy."  ECF
No. 146 at 34.  The policy itself provided that the minimum
monthly payment "will keep the policy in force to the next
Monthly Policy Date" during "the first and second Policy Years."

3

ECF No. 146-2 at 39.  The summary of coverage quoted the minimum
monthly premium as $116.24.

National Life claims that Policy 748 lapsed shortly prior to
Dr. Hucke's death because of overdue premium payments.  In
support, National Life has submitted a series of correspondence
sent to Dr. Hucke between 2008 and 2012 notifying him that "your
contract does not have sufficient value to pay the cost presently
due" and that premium payments were due within 30 days in order
to maintain coverage.  ECF No. 156-1 at 6-18.  While several of
the allegedly-overdue payments were made and the policy
reinstated on those occasions, in July 2012 National Life
informed Dr. Hucke that a payment of $1,132.26 was due on or
prior to August 3, 2012 in order to maintain coverage.  *Id.* at
18.  On August 10, 2012, National Life informed Dr. Hucke that it
had not received the required payment and that "there is
presently no coverage provided." *Id.* at 20.  Dr. Hucke died on
August 24, 2012.

Mrs. Hucke contends that Dr. Hucke paid, and in fact
overpaid, the premiums due on his policy through the date of his
death.  The First Amended Complaint alleges that as part of his
insurance application, Dr. Hucke requested that all premiums be
taken from his bank account as part of National Life's Check-O-
Matic system.  National Life allegedly informed the Huckes that
in additional to regular payments through Check-O-Matic, it would

also withdraw a special draft as needed to bring the policy current.  In 2004, National Life confirmed that a premium payment of $116.25 would be automatically deducted "to pay the premium due" on Policy 748.  ECF No. 143-3 at 15.

Mrs. Hucke claims that in 2008 National Life "inexplicably" removed Policy 748 from the Check-O-Matic program, and began sending the aforementioned delinquency notices.  She further claims that memoranda from National Life to Dr. Hucke's agent between 2008 and 2012 confirmed that the annual premium was approximately $1,395, or $116.25 per month.  Based upon a constant monthly premium payment of $116.25 per month, Mrs. Hucke argues the Dr. Hucke made timely payments through the time of his death, and that in some policy years he actually overpaid.  ECF No. 146 at 1-2.

In April 2014, Mrs. Hucke filed suit against National Life in Missouri state court seeking payment on Policy 748.  The action was subsequently removed to the United States District Court for the Western District of Missouri.  The First Amended Complaint brings causes of action for breach of contract, and in the alternative, "[e]ven assuming that [Dr. Hucke] and/or [Mrs. Hucke] were delinquent on their premium payments (which Plaintiff denies)," for estoppel based upon National Life's alleged course of dealing.  ECF No. 143-2 at 11.  Mrs. Hucke also argues that, assuming a lapse, Dr. Hucke died within the policy's 61-day grace

period.  ECF No. 143-3 at 20-21.

National Life's motion before this Court argues that Mrs. Hucke's suit is barred by the 1998 class action settlement and this Court's final order and judgment.  National Life characterizes Mrs. Hucke's claim as alleging a failure to assess the correct premium, and argues that such a claim pertains to the operation, administration, or servicing of a covered policy and is therefore barred.  National Life also submits that Mrs. Hucke's claim is "the very essence of a 'vanishing premium' allegation and lies at the heart of the claims released by the Settlement."  ECF No. 143 at 10.  The release defines a "vanishing premium" as

> (a) a concept under which an insurance policy's premiums or charges may be paid out of its then-current and anticipated accumulated values, or cash values or dividends, as those charges or premiums become due, (b) a concept under which a single out-of-pocket premium payment or a fixed number of out-of-pocket premium payments – based on nonguaranteed assumptions about interest crediting rates and policy charges or dividends – may suffice to cover all policy premiums and/or charges in excess of interest credited and may keep coverage in force throughout the insured's life, or for a specified period, without reducing the policy's death benefits at all or beyond a fixed amount, or (c) use of this term or the term "paid up" in connection with the sale of a policy.

ECF 143-1 at 11-12.

Mrs. Hucke does not contest that the Huckes were notified of the 1998 class action suit, and that they received a payment of $10.26 on Policy 748 as a result of the settlement.  ECF 143-4 at

5.  Her lawsuit in the Western District of Missouri has been stayed pending a ruling by this Court on National Life's motion to enforce the final order and judgment.

### Discussion

The sole issue before the Court is whether Mrs. Hucke's lawsuit is barred by the class action settlement, the release, and the Court's final order and judgment.  As noted above, this Court retained jurisdiction to enforce the judgment.  There is no dispute that Policy 748 was purchased during the time period covered by the settlement.

Mrs. Hucke's allegations have little in common with those that gave rise to the 1997 class action filing.  The class action, and the resulting settlement agreement, arose out of allegations that National Life had made misrepresentations and used improper tactics, such as "churning," to boost sales of its policies.  This Court previously characterized the class action claims as pertaining to "the number of cash premium payments that a policyholder would have to make;" "the cash value or other benefits that a policyholder would realize;" the "interest rate and cash value projections;" or "financing the purchase of new policies" through "churning."  *In re National Life Ins. Co.*, 247 F. Supp. 2d 486, 490 (D. Vt. 2002).  Mrs. Hucke's claims do not allege any such misrepresentations or tactics at the time she and her husband purchased their policies.  While some of Mrs. Hucke's

factual allegations date back to the time of inception, including Dr. Hucke's request for automatic premium deductions, her allegations focus primarily upon communications and transactions that occurred years after the class action settlement.  As a result of those communications and transactions, the parties now dispute whether Policy 748 was in effect at the time of Dr. Hucke's death.

Noting that Mrs. Hucke is alleging "a failure to assess the right premium," ECF No. 143 at 8, National Life cites a reference in the release to "a fixed number and/or amount of premium payments."  *Id.* at 10.  That portion of the release is followed by a parenthetical stating: "(less than the number and/or amount of payments required by the terms of the Policies)."  Here, Mrs. Hucke does not claim that the premiums charged by National Life were inconsistent with the policy terms, or that she and her husband were induced into buying the policy by means of any misrepresentations or misconduct.  Her claims are instead focused upon a course of conduct that occurred once the policy was in effect, and whether that conduct was consistent from the policy's inception through its termination.

National Life's most specific argument is that Mrs. Hucke alleges a "vanishing premium."  As defined in the release, a "vanishing premium" involves (1) premium payments out of accumulated policy values, (2) a single payment or fixed number

8

of payments to cover all policy premiums "based on nonguaranteed assumptions about interest crediting rates and policy charges or dividends," or (3) use of the terms "vanishing premium" or "paid up" in connection with the sale of a policy.  ECF No. 143-1 at 11.  Mrs. Hucke's First Amended Complaint does not assert any of these three scenarios, or that she and her husband were told that the premiums would "vanish" while the policy remained in effect. In fact, the policy's coverage summary stated that premiums were to be made through Dr. Hucke's death or though 2045, at which time, if Dr. Hucke were still alive, he would receive a payout. ECF No. 146 at 34.  There is no allegation in the First Amended Complaint that premium payments would cease or that the policy would ever be deemed "paid up" while the policy remained in place.  Accordingly, the Court will not enjoin Mrs. Hucke's lawsuit on the basis of a "vanishing premium" claim.

While Mrs. Hucke's claims have little in common with the allegations of misconduct that gave rise to the class action filing, a class action release may be broader than the claims brought in the underlying litigation.  Indeed, "[t]he law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d

Cir. 2005) (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675
F.2d 456, 460 (2d Cir. 1982); *see also In re Am. Express Fin.
Advisors Sec. Litig.*, 672 F.3d 113, 135 (2d Cir. 2011).  In *TBK
Partners*, the Second Circuit explained that

> where there is a realistic identity of issues between
> the settled class action and the subsequent suit, and
> where the relationship between the suits is at the time
> of the class action foreseeably obvious to notified
> class members, the situation is analogous to the
> barring of claims that could have been asserted in the
> class action.  Under such circumstances the paramount
> policy of encouraging settlements takes precedence.

675 F.2d at 461.

Here, the Court finds that it was not "foreseeably obvious"
at the time of the class action settlement that, as Mrs. Hucke
alleges, National Life would subsequently engage in a course of
conduct that would give rise to a coverage dispute.  Nor is there
a "realistic identity of issues" between the settled class action
and Mrs. Hucke's case, as Mrs. Hucke does not complain about
wrongful misrepresentations or tactics used to induce the sale of
a policy.

National Life compares this case to *In re National Life Ins.
Co.*, 247 F. Supp. 2d 486 (D. Vt. 2002), in which the Court
granted its motion for enforcement and enjoined a lawsuit based
upon the same final order and judgment.  In that case, Charlotte
Zitnick owned the SUR-VACC Packing Company, which in turn owned
two Connecticut Mutual life insurance policies insuring Zitnick's
life in the amount of $450,000.  A representative of Vermont Life

10

Insurance Company (which has since merged into National Life) recommended to Zitnick that she terminate the Connecticut policies, transfer their cash value to Vermont Life, and purchase a new policy with a $700,000 face value.  "The policy was intended to provide tax-free death benefits to the beneficiaries of the policy."  *In re National Life Ins. Co.*, 247 F. Supp. 2d at 490.

    Zitnick subsequently died, and National Life paid the death benefit.  However, Zitnick's estate was required to pay taxes on the benefit, and the estate sued National Life, among others, in California Superior Court alleging negligence and negligent misrepresentation.  National Life moved this Court for specific enforcement of the 1998 final order and judgment, claiming that Zitnick's estate was a member of the class and that its claims had been released.  The Court ruled in favor of National Life, noting that the release extinguished claims involving "'the use of an existing policy's . . . cash value or cash surrender value . . . to purchase . . . a new [National Life] Policy or other life insurance policy."  *Id.* at 494-95.

    Mrs. Hucke's claims do not resemble the Zitnick case.  Most significantly, there is no portion of the release that specifically addresses the course of communications between National Life and the Huckes that led to the current dispute. Furthermore, the allegations in Zitnick applied exclusively to

representations made at the time the policy was sold, while Mrs. Hucke relies primarily on post-sale conduct.

The Court acknowledges that "practically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability." *Wal-Mart Stores, Inc.*, 396 F.3d at 106 (citations and quotation marks omitted). Furthermore, a claim that "was not presented and might not have been presentable in the class action" may nonetheless be barred if it is "based on the identical factual predicate." *TBK Partners*, 675 F.2d at 460. Here, that common factual predicate is absent, as Mrs. Hucke's claims are based not upon misrepresentations or wrongful schemes used to induce a policy sale, but instead upon a course of conduct that, she claims, entitles her to collect on her deceased husband's life insurance policy. Accordingly, the Court finds that her claims are not barred by the settlement agreement, the release, or the Court's prior final order and judgment, and National Life's motion to enforce is DENIED.

## Conclusion

For the reasons set forth above, National Life's motion for leave to file a sur-rebuttal (ECF No. 162) is GRANTED, and its motion to specifically enforce this Court's final order and judgment and for a permanent injunction against plaintiff Betty Hucke (ECF No. 142) is DENIED.

Dated at Burlington, in the District of Vermont, this 19th day of September, 2014.

                                    /s/ William K. Sessions III
                                    William K. Sessions III
                                    U.S. District Judge